_____
                                        )
NEXSAN TECHNOLOGIES,                    )
INCORPORATED,                           )
                                        )
                Plaintiff,              )
                                        )
        v.                              )          CIVIL ACTION
                                        )          NO. 16-10847-WGY
EMC CORPORATION,                        )
                                        )
                Defendant.              )
_____)

YOUNG, D.J.                                        April 14, 2017

## FINDINGS OF FACT AND RULINGS OF LAW

### I.  INTRODUCTION

       The issue before this Court is trademark priority.  Nexsan

Technologies, Inc. ("Nexsan") is a manufacturer and provider of

computer data storage, backup, and management technologies.

First Am. Compl. ("Am. Compl.") ¶ 6, ECF No. 89.  EMC

Corporation ("EMC") is a Fortune 200 company that also develops

and manufactures data storage technologies.  Def. EMC

Corporation's Answer, Affirmative Defenses, & Countercls.

("Answer") 3 ¶ 12, ECF No. 20.  Since the commencement of this

suit, EMC has been acquired by Dell, Inc.  Id.

       In 2016, Nexsan and EMC each independently launched new

computer data storage systems branded "UNITY."  Am. Compl. ¶¶ 9,

21.  The parties dispute which company has the rights to the UNITY name.  On March 22, 2016, Nexsan filed two intent-to-use trademark applications with the United States Patent and Trademark Office ("USPTO"), requesting use of the UNITY and NEXSAN UNITY marks for computer data storage hardware and software.[1]  Id. ¶ 7.  Nexsan claims to have engaged in market research and testing to introduce its product and the UNITY mark prior to filing its application.  Id. ¶ 8.  EMC counters that it publicly used the UNITY mark first, in connection with its "VNX" product line beginning in early 2014.  Answer 11 ¶ 14.

Nexsan brought this action seeking declaratory judgment of priority and non-infringement of its trademarks[2] against EMC (count I) under 28 U.S.C. section 2201, and for false designation of origin and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125 (count II).  Am. Compl. ¶¶ 37-49.

The parties filed cross-motions for summary judgment on the issue of priority to the UNITY mark.  Nexsan Technologies, Incorporated's Mot. Summ. J., ECF No. 46; Def. EMC Corporation's Mot. Partial Summ. J., ECF No. 40.  Both briefed the issue and

---

[1] U.S. Trademark Application Serial No. 86,948,640 (filed Mar. 22, 2016); U.S. Trademark Application Serial No. 86,948,652 (filed Mar. 22, 2016).

[2] EMC also filed counterclaims against Nexsan for trademark infringement and unfair competition.  Answer 9 ¶ 5.  Those counterclaims are not addressed in this opinion.

submitted statements of fact.  Nexsan Technologies' Mem. Supp.
Mot. Summ. J. ("Pl.'s Mem.") 9, 15, ECF No. 47; Nexsan
Technologies, Inc.'s Mem. Opp'n EMC Corporation's Mot. Partial
Summ. J. ("Pl.'s Opp'n"), ECF No. 57; Nexsan's Local Rule 56.1
Statement Undisputed Facts ("Pl.'s Facts"), ECF No. 50; EMC
Corporation's Mem. Law Supp. Mot. Partial Summ. J. ("Def.'s
Mem."), ECF No. 53; EMC Corporation's Statement Undisputed
Material Facts ("Def.'s Facts"), ECF No. 54; EMC Corporation's
Resp. Nexsan's Local Rule 56.1 Statement Undisputed Facts
("Def.'s Additional Facts"), ECF No. 61; EMC's Reply Supp. Mot.
("Def.'s Reply"), ECF No. 65.  By agreement of the parties, the
Court held a case stated hearing[3] on January 11, 2017, on the
issue of priority of ownership of the UNITY mark.  This Court
now makes the following findings of fact and rulings of law.

## II.  FINDINGS OF FACT

### A.  Nexsan Registered the UNITY Mark in March 2016

In January 2016, Nexsan began researching brand names for a
recently developed computer technology.  Pl.'s Facts ¶ 7.  In

---

[3] The case stated procedure allows the Court, with the
parties' agreement, to render a judgment based on the largely
undisputed record in cases where there are minimal factual
disputes.  TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6
(1st Cir. 2007).  In its review of the record, "[t]he [C]ourt is
. . . entitled to 'engage in a certain amount of factfinding,
including the drawing of inferences.'"  Id. (quoting United
Paperworkers Int'l Union Local 14 v. International Paper Co., 64
F.3d 28, 31 (1st Cir. 1995)).

polls of Nexsan employees, UNITY was the most preferred of
prospective marks.  Pl.'s Facts ¶¶ 14-15; Decl. Judy Kaldenberg
Supp. Nexsan Technologies' Mot. Summ. J. ("Kaldenberg Decl.")
¶¶ 13-14, ECF No. 48.  On March 7, 2016, Nexsan completed a
trademark search for "UNITY" which revealed that the mark was
not yet used in relation to computer data technologies.
Kaldenberg Decl. ¶ 15; Suppl. Decl. Steven A. Abreu Supp. Nexsan
Technologies' Case In Chief Issue Priority, Ex. B Part 1
("Trademark Search Report"), ECF No. 78-2.  Nexsan subsequently
filed two intent-to-use applications for the UNITY mark with the
USPTO on March 22, 2016.  Pl.'s Facts ¶ 18; Def.'s Facts ¶ 33.
On April 25, 2016, CRN magazine, an industry publication,
previewed a favorable review of Nexsan's UNITY products.  Am.
Compl. ¶ 10.  The following day, Nexsan announced the release of
its UNITY line.  Id. ¶ 9.

### B. EMC's Pre-Market Activities Regarding Its UNITY Product

While Nexsan developed its UNITY products, EMC was
developing a similar computer system to manage data storage.
Def.'s Facts ¶¶ 3-4, 32.  Since at least 2015 -- well before
Nexsan's development -- EMC had conducted activities related to
the development and refinement of this product, which EMC
eventually called "UNITY."  Id. ¶ 3.  These activities included
giving presentations about and shipping beta versions of its

[4]

UNITY products to customers, partners, and potential customers. Id. ¶¶ 8-21.

### 1. "Virtual Geek" Blog

Chad Sakac ("Sakac"), an EMC employee, maintains "Virtual Geek,"[4] a blog that discusses trends in the "electronic data storage industry." Id. ¶ 6. The blog contains a disclaimer stating that it is personal in nature and not authorized by EMC. Pl.'s Facts, Ex. K, About Me ("Virtual Geek Disclaimer") 1, ECF No. 50-11 ("Content published here is not read or approved in advance by EMC and does not necessarily reflect the views and opinions of EMC. This is my blog, it is not an EMC blog.").

On May 5, 2014, Sakac published a Virtual Geek blog post titled "VNX architectural evolution keeps rolling (VNXe 3200 + Project Liberty)." Pl.'s Facts, Ex. J, VNX Architectural Evolution Keeps Rolling ("Virtual Geek Post") 1, ECF No. 50-10; Def.'s Facts ¶ 7. The post describes some of EMC's recent technologies and uses the word "unity" in reference to some of those developments, stating, for example, that "[w]e continue to stress and expand the footprint of the new 'Unity' code stack in VNXe," "with vNXe, the Unity codebase conversion is complete," and "[t]he Unity codebase in the VNXe is also the right vehicle." Virtual Geek Post 2, 4.

---

[4] Located at http://virtualgeek.typepad.com/about.html.
Def.'s Facts ¶ 6.

One EMC employee, Brian Henderson ("Henderson"), testified
that he first became aware of EMC's UNITY product via Sakac's
blog post.  Def.'s Facts, Ex. 2, Dep. Brian P. Henderson
("Henderson Dep.") 23:8-18, ECF No. 54-4.  Henderson, however,
was equivocal about his understanding of the post, stating: "I
think [Sakac] takes liberties, and I am not sure what is
happening in this, this section right here . . . . It is worded
really weird."  Pl.'s Facts, Ex. M., Sept. 27, 2016 Dep. Brian
P. Henderson ("Nexsan Henderson Dep.") 152:8-12, ECF No. 50-13.
Henderson also acknowledged that EMC used code names for the
Unity products, and that code names are rarely used as the
actual brand name.  Pl.'s Facts ¶¶ 27, 30.  This is done to
"obfuscate the name" of the final product.  Pl.'s Facts ¶ 29;
Nexsan Henderson Dep. 28:4-22.

### 2.  Beta Testing

EMC conducted beta testing on what would become its UNITY
products.  Answer 11 ¶ 16; Def.'s Mem. 5-6.  Participation in
the beta test program was limited to twenty organizations, each
handpicked by EMC.  Pl.'s Facts ¶¶ 39, 41; Pl.'s Facts, Ex. L
("Thunderbird Beta Opportunity E-mail"), at EMC-087537, ECF No.
50-12 ("Like any other EMC Beta test program, the number of
slots for customer participation is limited.  Participants will
need to meet the [listed] requirements.").  In December 2015,
EMC shipped beta versions of the products to the twenty select

organizations "for trial use and training." Def.'s Facts ¶¶ 14, 20; Def.'s Facts, Ex. 1, Decl. Brian Henderson ("Henderson Decl.") ¶¶ 4, 7, ECF No. 54-1. This testing continued into early 2016. Def.'s Facts ¶ 17.

### a. Beta Test Name

EMC's title for the product under testing was inconsistent. At various times, EMC called the tested product (or components thereof) "Thunderbird," "Oberon," and "UNITY." Pl.'s Facts ¶ 42; Thunderbird Beta Opportunity E-mail, at EMC-087536-37 ("In Q1 of 2016, the Corporate Systems Engineering team will be running the Thunderbird Beta program. As you may already know, the Thunderbird release is a brand new Unity platform that is expected to GA in Q2 of 2016.").

EMC frequently referred to the beta program as Thunderbird. For instance, in an e-mail from Jason Fonseca dated February 4, 2016, the subject line is "Unity Licenses." Decl. R. David Hosp Supp. EMC's Opp'n Nexsan's Mot. Summ. J., Ex. 9 ("Fonseca E-mail"), at EMC-083816, ECF No. 62-9. The opening sentence of the e-mail, however, says "[EMC] will be continuing customer testing next week as part of the Thunderbird Beta." Id. Similarly, in another EMC e-mail chain titled "CSE Feedback on Thunderbird Needed," EMC staff are asked to "provide feedback . . . on the Thunderbird product." Def.'s Facts, Ex. 25 ("Gento E-mail"), at EMC-035979, ECF No. 54-27. Additionally, the beta

project final report is titled "EMC Thunderbird: Beta, Final Report."  Suppl. Decl. Steven A. Abreu Supp. Nexsan Technologies' Case Chief Issue Priority, Ex. D, EMC Thunderbird: Beta, Final Report ("Thunderbird Final Report") 1, ECF No. 78-12.

Some beta test products displayed the UNITY mark, such as on the opening screen and the hardware bezel, Def.'s Facts ¶ 16, but there is no evidence that this occurred before Nexsan's registration of the UNITY mark.  Henderson testified that during beta testing, the UNITY mark did not appear on the hardware, but was added to the hardware "probably close to external launch" of the UNITY product.  Nexsan Henderson Dep. 109:9-110:2. Similarly, the UNITY opening screen is dated May 2016, Def.'s Facts, Ex. 7 ("EMC Unity Screen"), at EMC-037675, ECF No. 54-9, a date falling after Nexsan's March 22, 2016 registration of the mark, Pl.'s Facts ¶ 18; Def.'s Facts ¶ 33.

### b.   Beta Test Confidentiality

EMC required beta testers to sign confidentiality agreements.  Pl.'s Facts ¶ 40; Nexsan Henderson Dep. 173:18-174:2.  These agreements define "confidential information," in relevant part, as:

> any and all information or materials provided by one party
> to the other which are in tangible form and labeled
> "confidential" or the like, or, if disclosed orally, are
> identified as being confidential at the time of disclosure
> and are followed up within two (2) weeks in a tangible form

> that is appropriately labeled, but shall not include
> information or materials that (i) were, on the Effective
> Date of this Master Agreement, generally known to the
> public; or (ii) become generally known to the public after
> the Effective Date other than as a result of the act or
> omission of the receiving party.

Decl. R. David Hosp Supp. EMC's Opp'n Nexsan's Mot. Summ. J.,
Ex. 7, Customer Testing Program Master Product Test Agreement 1,
ECF No. 62-7. EMC's rationale for requiring a non-disclosure
agreement was, at least in part, a concern about "cannibalizing"
its own sales. See Kaldenberg Decl. ¶ 25 ("A common concern
when releasing a new product is declining sales of legacy
products . . . the customer typically does not want to buy
something that they know will be replaced in the near future.");
Decl. Robert Fernander Supp. Nexsan Technologies' Mot. Summ. J.
("Fernander Decl.") ¶ 11, ECF No. 49 ("If consumers become aware
that technological developments will be made in a soon to be
released product, they may decide to hold off on a purchasing
decision until after the launch of a product, which can hurt the
business's bottom line."). That is, EMC was aware that
prospective customers might hold off on buying its products if
they heard about the UNITY products' upcoming launch. Nexsan
Henderson Dep. 124:24-125:11. Such delayed purchases could hurt
the sales of EMC's existing product lines. Id.

### 3. Pre-Marketing Presentations

In March 2015, EMC began giving sales presentations about its UNITY products to current and potential customers. Def.'s Facts ¶ 8; Def.'s Facts, Ex. 3, EMC Unity Presentations and Beta Testing Dates 1, ECF No. 54-5; Henderson Dep. 199:12-201:6. In total, EMC delivered eighty-four presentations, each attended by up to 100 individuals from different groups of customers, distribution partners, and potential customers. Def.'s Additional Facts ¶ 65; Henderson Decl. ¶ 3. At times during the presentations, EMC used the UNITY mark to describe the products. Def.'s Additional Facts ¶ 65; Def.'s Facts, Ex. 4, South Carolina Federal Credit Union 48-49, ECF No. 54-6 (referencing the product as "Unity"); Def.'s Facts, Ex. 5, Partner Technical Summit Midrange Update, ECF No. 54-7 (referring to project consistently as "Unity" or "Unity.Next"). At other times, however, EMC used the Thunderbird name. E.g., South Carolina Federal Credit Union 49 (denoting "Thunderbird" on Unity 2015/2016 Aspirational Roadmap).

EMC required presentation attendees to sign non-disclosure agreements and reminded them of their confidentiality obligations at the beginning of each presentation. Pl.'s Facts ¶¶ 32, 37; Pl.'s Facts, Ex. P, XYZ: VNX Family Update ("XYZ Presentation"), at EMC-017122, ECF No. 50-16 ("This information is EMC Restricted Confidential and is provided under the terms,

conditions and restriction defined in the EMC Non-Disclosure

Agreement in place with your organization."); Pl.'s Facts, Ex.

Q, ABC, at EMC-001680, ECF No. 50-17 (providing the same

disclaimer as the XYZ Presentation).[5] EMC's standard non-

disclosure agreement states:

> Confidential Information will not include, or will cease to
> include, as applicable, information or materials that
> (i) were generally known to the public on the Effective
> Date; (ii) become generally known to the public after the
> Effective Date, other than as a result of the act or
> omission of the receiving party . . . .

Def.'s Facts, Ex. 11, EMC Nondisclosure Agreement 1, ECF No. 54-

13.

## C. Nexsan's Knowledge of EMC's Use of UNITY Mark

On March 7, 2016, Nexsan received a trademark report for

the UNITY mark, which revealed no use of the UNITY mark in

relation to computer data storage, let alone use by EMC. <u>See</u>

<u>generally</u> Trademark Search Report.

On March 19, 2016, a Nexsan employee, David Grey ("Grey"),

sent an e-mail to his supervisor, Judy Kaldenberg

("Kaldenberg"), in which he wrote: "Do we have the trademark for

Unity? I've been told EMC is launching a replacement to VNXe

with the product name Unity this May." Def.'s Facts, Ex. 12

---

[5] This Court, respecting the protective order entered on
July 11, 2016, WGY Protective Order, ECF No. 30, uses generic
names when referring to any customers identified in sealed
filings.

("Grey E-mail"), at NEXSAN-000404, ECF No. 54-14; Kaldenberg
Decl. ¶ 17.  While at a bar with other Information Technology
("IT") professionals, Grey had overhead rumors of EMC's upcoming
launch of UNITY.  Kaldenberg Decl. ¶ 17; Def.'s Facts, Ex. 17,
Dep. Judy Kaldenberg ("Kaldenberg Dep.") 15:24-17:2, ECF No. 54-
19.  Kaldenberg subsequently performed an Internet search for
EMC and UNITY, but did not find any relationship between EMC and
UNITY aside from Sakac's Virtual Geek blog post and a comment on
a blog post.  Kaldenberg Decl. ¶ 19.  On March 22, 2016, Nexsan
filed trademark applications with the USPTO to register the
UNITY mark.  Pl.'s Facts ¶ 18; Def.'s Facts ¶ 33.

On May 23, 2016, Nexsan's Senior Marketing Director, John
Merrill ("Merrill"), sent an e-mail regarding Nexsan's search
engine optimization strategy for its UNITY product.  Def.'s
Facts, Ex. 23 ("Nexsan SEO E-mails"), at NEXSAN-001820, ECF No.
54-25.  Merrill wrote: "Intent is to have paid search terms for
EMC Unity that will hit a landing page about EMC Unity, but lead
them over to learn more about Nexsan Unity -- bate [sic] and
switch."  <u>Id.</u>

**D. EMC Files for the UNITY Trademark**

On April 29, 2016, EMC filed for trademark registration of its UNITY marks in connection with computer goods and services.[6] Def.'s Facts ¶ 22.  On May 2, 2016, EMC publicly launched its UNITY products at the company's annual trade show.  Id. ¶ 23.

**III.  RULINGS OF LAW**

EMC asserts that its beta testing and pre-market presentations establish its priority to the UNITY mark.  Def.'s Mem. 15-18.  Nexsan counters that EMC's pre-sale activities were not extensive enough to grant EMC priority.  Pl.'s Opp'n 13-17. This Court concludes that EMC has not carried its burden to establish prior use, and thus Nexsan has priority to the UNITY mark based on its intent-to-use applications.

**A.  Legal Framework**

Notice and notice failure play a major role in intellectual property law.  Borrowing from analogous doctrines in the law of copyright, trademark holders are "granted exclusive rights as a way to promote socially beneficial goods.  But if these exclusive rights are not calibrated correctly, they can impose more costs than public benefits.  In other words, [trademark] can end up suppressing more communicative activity than it encourages."  Amanda Reid, Claiming the Copyright, 34 Yale L. &

---

[6] U.S. Trademark Application Serial No. 87,020,237 (filed Apr. 29, 2016); U.S. Trademark Application Serial No. 87,020,119 (filed Apr. 29, 2016).

Pol'y Rev. 425, 426 (2016).  "Notice of [these] preexisting rights plays a critical role in resource planning."  Peter S. Menell, Economic Analysis of Copyright Notice: Tracing and Scope in the Digital Age, 96 B.U. L. Rev. 967, 968 (2016).

In the United States, an individual may acquire trademark rights in two ways: under the Lanham Act, 15 U.S.C. §§ 1051-72, or common law.  General Healthcare Ltd. v. Qashat, 364 F.3d 332, 335 (1st Cir. 2004) (citing United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918)).  "[I]n either circumstance, the right is conditioned upon use in commerce."  Id.

First, a party may file for registration of a mark with the USPTO if it presently uses, or has a bona fide intention to use, the mark in commerce.  15 U.S.C. § 1051.  While registration does not give a presumption of entitlement to the mark, it does place the burden of proof on any party seeking priority to the registered mark based on prior use.  See Hydro-Dynamics, Inc. v. George Putnam & Co., 811 F.2d 1470, 1472 (Fed. Cir. 1987).

The second method of acquiring ownership of a mark is by showing prior use, see Herbko Int'l, Inc. v. Kappa Books, Inc., 308 F.3d 1156, 1162 (Fed. Cir. 2002), even absent registration, see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011) (Gorton, J.) (citing Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 815 (1st Cir. 1987)).  Ownership via prior use may be acquired in two ways:

(1) making "first actual use of a mark in a genuine commercial transaction," Allard Enters. v. Advanced Programming Res., Inc., 146 F.3d 350, 358 (6th Cir. 1998); see also, Bayshore Grp. Ltd. v. Bay Shore Seafood Brokers, Inc., 762 F. Supp. 404, 411 (D. Mass. 1990) (Bowler, M.J.); or (2) having "prior use analogous to trademark or service mark use," Herbko, 308 F.3d at 1162.

In order to satisfy the "use in commerce" requirement, a party asserting prior commercial use of a mark must demonstrate that the mark was affixed to goods, and those marked goods "[were] sold or transported in commerce." 15 U.S.C. § 1127(1)(B) (emphasis added). Transportation alone, without sale of goods, is sufficient to establish trademark rights if it raises "an element of public awareness of the use." General Healthcare, 364 F.3d at 335. Whether the "use in commerce" requirement is satisfied is assessed on a case-by-case basis, based on the totality of the circumstances. See Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1159 (9th Cir. 2001); see also International Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 365, 371 (S.D.N.Y. 2007).

A party can claim priority when the prior use is an analogous use, i.e., there is "evidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."

New England Duplicating Co. v. Mendes, 190 F.2d 415, 418 (1st Cir. 1951); see also Herbko, 308 F.3d at 1162.  Analogous use is a fact-specific inquiry, Mendes, 190 F.2d at 418, which "does not require direct proof of an association in the public mind," Herbko, 308 F.3d at 1162.  Generally, the party is required to demonstrate that its use of the mark "was sufficiently clear, widespread, and repetitive to create the required association in the minds of potential purchasers between the mark as the indicator of a particular source and the service to become available later."  T.A.B. Sys. v. PacTel Teletrac, 77 F.3d 1372, 1376 (Fed. Cir. 1996).

Because Nexsan filed intent-to-use trademark applications for the UNITY mark on March 22, 2016, Pl.'s Facts ¶ 18; Def.'s Facts ¶ 35, the burden rests on EMC to prove its priority to the UNITY mark.  See Hydro-Dynamics, 811 F.2d at 1472.  In particular, EMC must demonstrate "prior use sufficient to create an association in the minds of the purchasing public between the [UNITY] mark and [EMC's UNITY products]."  Herbko, 308 F.3d at 1162.  Such use must be "open and notorious," T.A.B. Sys., 77 F.3d at 1376; see also American Express Co. v. Goetz, 515 F.3d 156, 161 (2d Cir. 2008), and proven by a preponderance of the evidence, see Sengoku Works Ltd. v. RMC Int'l Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996).

## B. EMC's Beta Testing Does Not Confer Priority

EMC alleges that its beta testing in part warrants EMC's priority to the UNITY mark via analogous use. Def.'s Mem. 5-6. This Court holds that EMC's beta test does not establish priority for three reasons: (1) the group of participants was too small to form a substantial segment of EMC's customer base, (2) the beta test was confidential, and (3) EMC did not consistently use the UNITY name.

Evaluation of analogous prior use through beta-testing is dependent on the nature and extent of the specific beta test as well as other supporting factors. See CCBN.com, Inc. v. C-call.com, Inc., 73 F. Supp. 2d 106, 111 (D. Mass. 1999) (Saris, J.). For example, one court held that a public beta test of a social media application on a website "was 'sufficiently public' to establish 'use' in the trademark sense." Boathouse, 777 F. Supp. 2d at 249. In another case, however, a court expressed skepticism about whether a private beta test with a small group of hand-selected participants was sufficiently public so as to confer priority. CCBN.com, 73 F. Supp. 2d at 110, 111. In order for beta-testing to be a sufficient basis for priority, that testing must reach a sizable proportion of the relevant public, and the testing cohort must constitute more than a small, hand-picked group. See id. at 111.

EMC conducted a small, closed beta test with twenty participant organizations. Pl.'s Facts ¶ 39. EMC, however, states that it markets its products to "tens of thousands of customers." Pl.'s Facts ¶ 4; Henderson Dep. 43:1-10. Twenty beta testers are an insubstantial proportion of this market. Cf. CCBN.com, 73 F. Supp. 2d at 111. Indeed, the vast majority of the relevant public never learned of UNITY, and thus could not associate the UNITY mark with EMC by means of the beta tests. Cf. Mendes, 190 F.2d at 418 (establishing priority where plaintiff "used the mark in publicizing his product in a leading trade periodical").

Additionally, each beta tester was bound to secrecy by a non-disclosure agreement that required the signee to keep confidential both the technical details of the test product and the product name(s). Pl.'s Facts ¶¶ 39-40; Nexsan Henderson Dep. 173:18-174:2. Because it was EMC's plain intent for the tested product and its associated names to remain non-public, it is unreasonable to believe that the beta test established "open and notorious" publicity. See T.A.B. Sys., 77 F.3d at 1375-76 (finding analogous use claim fails where "no evidence was presented enabling one to infer that a substantial share of the consuming public had been reached"); see also American Express, 515 F.3d at 161-62.

Moreover, EMC failed to refer consistently to the tested products as UNITY. In fact, EMC identified the goods with numerous monikers, often within the same document. Thunderbird Beta Opportunity E-mail, at EMC-087536; Thunderbird Final Report; Gento E-mail, at EMC-035978-79. Using different names during beta testing diminishes the public's ability to associate a single mark with the tested goods, as it is unclear which mark to attach to the goods. This renders use of the mark insufficiently clear or repetitive to establish priority. Accordingly, this Court rules that EMC did not use the UNITY mark in a manner that was clear, widespread, or repetitive enough for the beta tests to constitute analogous use sufficient to establish priority for the UNITY mark.

### C. EMC's Pre-Sale Presentations Do Not Confer Priority

EMC also argues that its eighty-four pre-sale presentations were sufficiently public to support priority. Def.'s Mem. 15-18. In response, Nexsan contends that the presentations cannot support priority because they were shrouded in secrecy and reached an insufficient proportion of the relevant public. Pl.'s Mem. 15-16. This Court holds that EMC's presentations do not support priority.

While courts have stated that pre-sale publicity activities such as demonstrations and presentations "may be adequate to establish prior use in commerce," International Healthcare, 470

F. Supp. 2d at 371 (internal quotation marks and citations
omitted), absent actual sales, some courts have required pre-
sales marketing to be "sufficiently extensive," CCBN.com, 73 F.
Supp. 2d at 110 (citing New West Corp. v. NYM Co. of Cal., Inc.,
595 F.2d 1194, 1200 (9th Cir. 1979)). For example, a "handful
of presentations, seminars and lectures" over a two-year period
was insufficient to establish analogous use, id.; but extensive
pre-sale presentations coupled with beta-testing was sufficient,
Boathouse, 777 F. Supp. 2d at 249.

Although the record lacks the precise number of attendees
at EMC's pre-sale presentations, up to 100 people attended each
presentation, totaling over 1,000 individuals. Henderson Decl.
¶ 3. EMC's customer base for its UNITY products, however, is
"IT Departments," Henderson Dep. 43:2-7, not individuals. Thus,
the appropriate inquiry is whether the number of IT departments
represented at the eighty-four presentations reached a
sufficient proportion of the relevant public (i.e., IT
departments). See Mendes, 190 F.2d at 418. EMC boasts at least
10,000 prospective customers for its UNITY product. Henderson
Dep. 43:2-10. Presentations reaching only 84 to 1,000 out of
more than 10,000 customers are insufficiently public so as to
link the UNITY name and EMC's associated product. See
International Healthcare, 470 F. Supp. 2d at 371.

This conclusion is bolstered by EMC's requirement that presentation attendees sign non-disclosure agreements. Although EMC contends that the non-disclosure agreements extended only to the technical specifications of the technology discussed, not to the "UNITY" name associated with the technology, Def.'s Facts ¶¶ 26-27, this is unsupported by the broad and unqualified language of the agreements. It is illogical to believe that presentation attendees would be able to mention "UNITY" freely, but, when asked what UNITY is, merely be able to reply "I cannot say." Rather, the far more logical interpretation is that the agreements rendered confidential both the UNITY name and underlying technology. The non-disclosure agreements thus foreclose the publicity that is the hallmark of analogous use.

EMC asserts that the UNITY name was already public because of the Virtual Geek blog post, EMC's pre-sale activities, and "word of mouth," Def.'s Facts ¶¶ 24, 27; Henderson Dep. 45:13-15, as evidenced by Nexsan's knowledge that EMC planned to use the UNITY name, Def.'s Reply 3. This argument is unavailing.

The Virtual Geek blog's references to "unity" are not public references to EMC's UNITY product for three reasons. First, the blog is clearly personal in nature and is not authorized by EMC. Virtual Geek Disclaimer 1. A member of the public would not reasonably believe that the words used in the blog reflect actual commercial intent or authorization by EMC.

That is, the words selected -- including "unity" -- are Sakac's and Sakac's alone.  Second, Henderson's testimony reveals that the post's language is unclear.  See Nexsan Henderson Dep. 152:8-12.  Given the ambiguous wording, a reader would not reasonably presume that Sakac's words reflect definite commercial intent on the part of EMC, especially regarding something as precise as a trademark.  Third, the industry practice of "obsfucat[ing]" trade names, Fernander Decl. ¶ 10, supports the Court's finding.  Even if a reader understood Sakac's blog post and believed that it reflected commercial intent by EMC, that reader would undoubtedly not identify "unity" as a trade name.  Rather, a reader would interpret "unity" as either a generic descriptor or a pseudonym.

Additionally, because the non-disclosure agreements forbade the signers from publicly discussing the UNITY name, any word of mouth marketing -- i.e., discussions between presentation attendees or beta testers and other potential customers -- would fail to create the required association between EMC and the UNITY mark.  Even if the presentation attendees or beta testers spoke openly amongst themselves, any such conversations would continue to limit knowledge of UNITY to the same insubstantial fraction of the relevant market.  There is no evidence before the Court to suggest any other venue through which word of mouth marketing using the UNITY name could have occurred.

Lastly, Nexsan's knowledge of EMC's potential UNITY trademark does not establish public awareness. Grey's overhearing a single conversation, Grey E-mail, at NEXSAN-000404; Kaldenberg Decl. ¶ 17, and Kaldenberg's resulting discovery of the Virtual Geek blog, Kaldenberg Decl. ¶ 19, does not establish that a wider segment of EMC's customer base would link EMC and the UNITY name. Although this Court finds Merrill's "bate [sic] and switch" e-mail extremely reprehensible, because the email was sent after Nexsan's trademark filing, Pl.'s Facts ¶ 18; Def.'s Facts ¶ 33; Nexsan SEO E-mails, at NEXSAN-001820, it does not establish public awareness at the time of Nexsan's filing.[7] Accordingly, this Courts rules that EMC's pre-sale presentations do not establish prior use.

---

[7] In this context, "bait and switch" could indicate a commercial intent to piggyback on another vendor's product. EMC argues that Nexsan's use of such a strategy is evidence that Nexsan acted in bad faith when it rushed to file its trademark applications. Def.'s Reply 9-10. This, however, does not accord with the Court's holdings. Having held that the public was not aware of EMC's use of the UNITY mark prior to Nexsan's filing, this Court cannot conclude that Nexsan filed in an effort to benefit from the EMC's goodwill in the UNITY mark. Therefore, although evidence of a "bait and switch" strategy is irrelevant here, it ought be condemned, if proven. At this stage, this Court withholds judgment as to whether Nexsan <u>actually</u> attempted to fraudulently confuse consumers. The consequences of Merrill's conduct shall be considered during further proceedings in this case.

## IV.  CONCLUSION

For the foregoing reasons, this Court rules that Nexsan has priority over EMC to the UNITY trademark in relation to computer data storage and associated technologies.  Further proceedings shall take place in accordance with this determination of trademark priority.

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE